UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-MC-22665-CIV-ALTONAGA/Goodman

SECURITIES AND EXCHANGE
COMMISSION,

    Applicant,

v.

WOODBRIDGE GROUP OF COMPANIES,
LLC,

    Respondent.
_____/

## WOODBRIDGE GROUP OF COMPANIES, LLC'S RESPONSE TO APPLICANT'S MOTION FOR EXPEDITED TREATMENT OF APPLICATION FOR ORDER ENFORCING ADMINISTRATIVE SUBPOENA

Woodbridge Group of Companies, LLC ("Woodbridge") respectfully presents its response to Applicant Securities and Exchange Commission ("SEC")'s Motion Requesting an Order to Show Cause Ordering Defendant to Appear Pursuant to Plaintiff's Application for an Order Enforcing an Administrative Subpoena [D.E. 9], filed on August 10, 2017. The SEC's efforts to create a sense of urgency notwithstanding,[1] the subpoena in question ("Subpoena") was

---

[1] The SEC tries to attach a false sense of urgency to its application by misleading the Court as to the amount and sources of Woodbridge's funding. While Woodbridge has raised a significant amount of money in Regulation D offerings (an amount that as a private company it keeps confidential), it is far less than the "billion" dollars alleged by the SEC (D.E. 1 at ¶ 5). Additional capital is available from lenders whose loans are fully secured by first position mortgages on real estate. A candid filing would inform this Court that Woodbridge's mortgage and lien priority are insured fully by national title insurance companies; the underlying real estate is likewise fully insured by policies underwritten by Lloyd's of London or equally reputable carriers; and Woodbridge's lenders are secured as evidenced by individualized documentation recorded with the applicable governmental land records office—and all of this information is publicly available to the SEC. The SEC opts not to report to the Court other critical information: Woodbridge has real estate holdings, as valued by certified appraisers, before improvements at in excess of $500 million, which is also verifiable by inspection of the public record. After

1

issued in January of this year and by its terms calls for virtually every corporate document in Woodbridge's possession dating back almost six years. *See* "Attachment C" to the Decl. of S. Lowry, D.E. 1-2 at 22-30. What is glossed over in the SEC's Application is that, despite the breathtaking scope of its demands, Woodbridge has been complying with the Subpoena, and complying at a formidable pace: the company has produced nearly a million pages of documents responsive to the extensive laundry list of sub-topics (30 in all) that the SEC Subpoena identifies. In fact, after Woodbridge's imminent next round of planned production, emails (and some telephone recordings) will be the *only* documents Woodbridge has not yet had time to address.

Upon realizing that the terms of the Subpoena would call for emails numbering in the hundreds of thousands, Woodbridge initiated discussions in March (and has been continuing to pursue those discussions) to get from the SEC a manageable narrowing of its various demands. While a final result has not yet been reached, Woodbridge submits that expedited proceedings are unwarranted and, in fact, will frustrate the parties' ultimate objective that Woodbridge be provided with guidance in selecting a reasonable and manageable subset of emails relevant to the SEC's inquiry, which it can review for privilege and produce. Accordingly, Woodbridge requests a non-expedited briefing schedule that will allow the parties time to continue

---

improvements, as valued by an independent third party, that real estate will be worth over a billion dollars. Of course, Woodbridge's possession of hard assets that exceed the SEC's inflated estimates of investor exposure does not fit the SEC's narrative. The accurate version is that Woodbridge purchases high-end real estate, redevelops and improves those properties, and sells them at a profit. Through its various financial products, Woodbridge provides accredited investors the opportunity to participate in a business that Woodbridge's managers have honed though decades of experience. Woodbridge's response to SEC subpoenas documents this successful business plan as it includes extensive documentation and hundreds of hours of witness testimony relating to the purchase and sale of each property, including information verifying each and every investor and lender in any way attached to the acquisition, renovation, and sale. In the event that the Court issues an order to Show Cause, Woodbridge will provide further information as to the amounts raised and documentation of the value of Woodridge's real estate holdings will be submitted under seal.

discussions, and perhaps avoid the need for the Court's intervention. In fact, given Woodbridge's track record of compliance with the onslaught of subpoenas in this matter, the SEC had and has no reasonable basis for believing that emails in response to a reasonably focused request would not be forthcoming.

## BACKGROUND & ARGUMENT

At the heart of the SEC's Application is the provision of the Subpoena that demands essentially any and all company emails "concerning Woodbridge's Offerings." D.E. 1-2 at 29. While subsequent paragraphs of the Subpoena can be read to limit the universe of emails to just those among Woodbridge, its sales agents, and its customers, that universe comprises hundreds of thousands of emails and represents an impossible burden to review for responsiveness and privilege and to produce. What the Subpoena seeks, as written, simply cannot be done.

Nevertheless, and as is customary in email productions, Woodbridge initiated a dialogue in the hopes of identifying mutually acceptable search terms to run through the database to find responsive emails. Woodbridge first proposed this approach to email production back on March 17, 2017, when the daunting scope of the SEC's request—which by this point had expanded beyond company emails to employees' personal emails[2]—became clear. Hearing nothing, on April 21, 2017, Woodbridge took the initiative and proposed a list of 23 search terms. (Ex. A.) After another month passed, the SEC finally responded by letter dated May 18, 2017. That letter purported to "prioritize" Woodbridge's production of emails by limiting the custodians, but in fact expanded the scope of the emails sought. (Ex. B.) And rather than discuss which of the 23 proposed terms would be most useful, the SEC demanded Woodbridge run all of its 23

---

[2] As Woodbridge's IT Director confirmed, several Woodbridge employees started working at Woodbridge long before the company grew large enough to have its own Woodbridge email domains. The business-related emails of these employees, therefore, are with personal email providers such as AOL.

proposed terms plus an additional 34 search terms of such generality that they would be all-but-useless in narrowing the scope of production.  The end result was an unwieldly list of fifty-three search terms for each custodian.  The company's investigation revealed that more than half of these terms, predictably, yielded results in the thousands of emails, an impossible number to manually review, which it has told the SEC.  (*See* Ex. D.)

Woodbridge has continued to attempt to reach a reasonable resolution to this issue with the SEC and was in the midst of a continuing dialogue when the SEC, without warning, filed this enforcement Application on July 17, 2017.  D.E. 1.  In the interest of saving time and expense, Woodbridge agreed to waive formal service of the SEC's Application on July 18, 2017.  D.E. 6.  And even after the SEC initiated this proceeding, Woodbridge has continued discussions with SEC litigation counsel to seek a resolution of the email production problem. (Ex. C & Ex. D)

As the SEC correctly notes in its motion, these proceedings to enforce an administrative subpoena are governed by the Federal Rules of Civil Procedure, absent an intervening court order.  *See* Fed. R. Civ. P. 81(a)(5); *United States v. Elmes*, 532 F.3d 1138, 1142 (11th Cir. 2008).  This includes the service provisions of Rule 4 of the Federal Rules of Civil Procedure. *Elmes*, 532 F.3d at 1143; *United States v. Bichara*, 826 F.2d 1037, 1039 (11th Cir. 1987). Additionally, while this Court indisputably has discretion to limit application of the Federal Rules in this proceeding, it may do so only "so long as the rights of the party summoned are protected."  *Elmes*, 532 F.3d at 1142 (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)).

As mentioned, Woodbridge agreed in good faith to waive formal service in this matter.  By doing so, Woodbridge is entitled under the Federal Rules to sixty days to prepare its response to the Application. Fed. R. Civ. P. 4(d)(3).  Woodbridge plans to respond within the sixty days,

4

or in other words, by September 15, 2017. Expediting the response date will prejudice Woodbridge and render its good-faith waiver of service unavailing and, more generally, undercut the incentives for others to waive service in the future.

The SEC, on the other hand, will not be prejudiced by permitting Woodbridge the time it is due to respond. First, the response period is already halfway over. Second, the fact that the Subpoena was issued nearly seven months ago and the fact that the SEC itself has repeatedly delayed in responding to Woodbridge's proposals to reach a reasonable accommodation of the email issue belie the SEC's assertions of urgency here. And finally, and most importantly, Woodbridge continues to seek to resolve the email production issue and has every intention of responding to a reasonably limited request. (*See* Ex. C & Ex. D) Rather than distract Woodbridge with an unnecessarily expedited briefing schedule and hearing, the parties' time and effort would be better spent focusing their resources on reaching a mutually acceptable compromise, potentially mooting the SEC's Application.

Woodbridge respectfully requests that the Court deny the SEC's motion for an expedited schedule, permit Woodbridge to respond by September 15, 2017, as provided in the Federal Rules of Civil Procedure, and to schedule a hearing to resolve the SEC's Application, if still needed, at some appropriate time after that.

DATED: August 18, 2017           By:      */s/ David Nelson*
                                          DAVID NELSON (Fla Bar No. 84531)
                                          JAMES GRIPPANDO (Fla Bar No. 383015)
                                          BOIES SCHILLER FLEXNER LLP
                                          401 East Las Olas Blvd, Suite 1200
                                          Fort Lauderdale, FL  33301
                                          Phone:  (954) 356-0011
                                          Fax:   (954) 356-0022
                                          dneslon@bsfllp.com
                                          jgrippando@bsfllp.com
                                          *Attorneys for Woodbridge Group of Companies, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via CM/ECF this 18th day of August 2017 to all counsel of record on the Service List below.

By: */s/ David Nelson*
David Nelson

## SERVICE LIST

Christine Nestor
Russell Koonin
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154
Email: nestorc@sec.gov
Email: kooninr@sec.gov

*Attorneys for Applicant Securities & Exchange Commission*