# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  17-MC-22665-CIV-ALTONAGA

SECURITIES AND EXCHANGE
COMMISSION,

        Applicant,

v.

WOODBRIDGE GROUP OF
COMPANIES, LLC,

        Respondent.

_____/

**DECLARATION OF ROBERT REED, ESQ. IN SUPPORT OF WOODBRIDGE'S
OPPOSITION TO SECURITIES AND EXCHANGE COMMISSION'S
APPLICATION FOR ORDER TO SHOW CAUSE**

ROBERT REED, pursuant to 28 U.S.C. §1746, declares under penalty of perjury as follows:

1.      I am an attorney and am a member in good standing of the Connecticut Bar Association.  I hold a Juris Doctor degree from the University of Connecticut School of Law, am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2.      I employed by Woodbridge Group of Companies, LLC ("Woodbridge") as Associate Counsel.  Since October 2016, my responsibilities have included overseeing Woodbridge's responses to formal and informal requests for information under the investigation captioned "Woodbridge Mortgage Investment Fund III, LLC (FL-04024)," conducted by the United States Securities and Exchange Miami Regional Office (the "SEC Investigation").  These tasks include, without limitation, legal advice rendered to Woodbridge and its employees;

identification, review, analysis and production of documents that are responsive to SEC requests and subpoenas; meetings and communications with Woodbridge employees, subpoenaed witnesses, other members of the Woodbridge legal department, and with outside counsel; review and analysis of subpoenas, responses to subpoenas, and other documents related to the SEC investigation; and other related matters.

3.    To date, Woodbridge in-house legal staff, with the assistance of outside counsel, has responded to 70 SEC subpoenas directed to 41 different individuals and 9 different entities in 10 different states.  Additionally, Woodbridge in-house legal staff, without assistance from outside counsel, is responding to 210 SEC subpoenas served by the SEC on August 16 and 17, 2017.  These subpoenas seek documents from each limited liability company involved in the purchase and sale of real estate since 2012.  (Consistent with best practices in the industry, Woodbridge structures real estate transactions through LLCs.)

4.    I estimate that I personally have devoted close to 1,000 hours to matters related to the SEC Investigation since it began in earnest last fall.  Approximately 80% of my time has been devoted to the SEC Investigation and related matters.

5.    I have reviewed and am familiar with the "Securities and Exchange Commission's Application for an Order Enforcing an Administrative Subpoena" (the "Application").  As stated by the SEC, the Application addresses three items:  (a) three documents referenced during the testimony Woodbridge employee "DB" (hereinafter the "DB Documents"); (b) company emails; and (c) creation of a privilege log.

6.    Woodbridge produced the DB Documents to the SEC prior to this Court's entry of the Order to Show Cause (WOODBRIDGE SEC_884681 – 884683).  (Tab 1.)  Accordingly,

2

this declaration addresses the remaining issues relating to (a) email production, and (b) privilege log.

### *Woodbridge's Compliance with the Subpoena*

7.      In October 2016 Woodbridge received notice of the SEC Investigation. Woodbridge retained the law firm of Boies Schiller Flexner LLP ("BSF") to represent Woodbridge and its related entities.

8.      In November 2016 BSF met with the SEC staff in Miami on behalf of Woodbridge.  The focus of the discussion was on the FPCMs.

9.      On December 20, 2016, BSF accepted the first SEC document subpoena on behalf of Woodbridge.  The subpoena stated "YOU MUST PRODUCE everything specified in the Attachment to this subpoena no later than Wednesday, December 28, 2016."  The staff and Woodbridge had been in communication since October.  The staff offered no explanation as to why it suddenly needed to serve a subpoena just days before Christmas or why it needed all documents returned three days after Christmas.  Nonetheless, Woodbridge complied.

10.     On January 31, 2017, Woodbridge received the document subpoena that is the subject of the SEC Application.  Until this subpoena, Woodbridge had focused its internal resources primarily on the identification and collection of documents relating to the FPCMs, which was the Company's understanding as to the focus of the investigation.  However, the January 31, 2017, subpoena grew to include Woodbridge's internal accounting and other financial records related to the offer and sale of Units pursuant to Regulation D.  The SEC's shift, in turn, required a significant increase and reallocation of resources internally at Woodbridge to comply with the subpoena.

11.     Upon receipt of the Subpoena, I undertook an in-depth review to ascertain sources of potentially responsive documents.  Because of the breadth of the Subpoena, I sought the advice of outside counsel to assist in developing a response plan.  The Subpoena contained 30 subparts (including three requesting emails). Nowhere did the Subpoena attach any particular "priority" to any of the 30 categories.

12.     With the assistance of Woodbridge legal and non-legal personnel, I undertook to identify and delineate the universe of Woodbridge documents that were potentially responsive to the Subpoena.  The list was extensive.  The general categories included, without limitation: (a) Private Offering Documents; (b) Human Resources, including Third-Party Referral Compensation; (c) Affiliate Real Estate Holding Companies; (d) Senior Position Debt; (e) Development Projects; (f) Loan And Property Proceeds; (g) Financial and Accounting records, including processing and accounts payable; (h)  Marketing, including website (all products); (i) Sales (all products); (j) Operations (all products); and (j) Business Data Compilations, Summaries, Calculations, and Reports.

13.     In the interest of efficiency and completeness, Woodbridge responded to the Subpoena by producing documents as kept in the ordinary course of business on a rolling basis. To the extent practical, Woodbridge endeavored to produce documents chronologically and within the sequential order of the 30 subparts set forth in the Subpoena (i.e., 1.a., 1.b., 1.c. etc., followed by 2.a., 2.b., etc.).

14.     In response to the Subpoena and other ancillary SEC requests, the Company has produced internal financial records and over a million pages of other business records relating to the FPCMs, Unit sales to accredited investors, Woodbridge's real estate portfolio that Woodbridge has acquired and developed (primarily in and around Beverly Hills, California, a/k/a

the "Platinum Triangle," and Aspen, Colorado), and the many other areas of interest identified in the subpoenas and related document requests. The Company has also provided direct access to the Company's internal bookkeeping data in Native format (software programs called Quickbooks and Excel). Attached to my Declaration at Tab 2 is a "Master Production Log" that lists by date and Bates number the documents produced to the SEC.

15.     Since the service of the Subpoena in January, the SEC investigation has continued to expand. As of September 5, 2017, the Woodbridge in-house legal staff, with the assistance of outside counsel, has been directly involved in responses to no fewer than 70 administrative subpoenas issued by the SEC.

16.     The first subpoenas were directed to dozens of distinct Woodbridge entities,[1] at offices in six different states (California, Colorado, Connecticut, Florida, Tennessee and New Jersey) only one of which is located in the Southern District of Florida (the "Woodbridge Subpoenas").

_____

[1] The January 31, 2017 SEC Subpoena defines the term "Woodbridge" to include "the entity doing business under the name "Woodbridge Group of Companies, LLC," including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing." Other subpoenas defined "Woodbridge" to include "Woodbridge Group of Companies, LLC, Woodbridge Lending Fund I , LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, Woodbridge Crowdfunding 1, LLC, Woodbridge Luxury Homes of California, d/b/a Mercer Vine, Woodbridge Mortgage Investment  Fund  1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund, 3, LLC, Woodbridge Mortgage Investment Fund, 3a, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Realty of Colorado, LLC, Woodbridge Capital Investments, LLC, Woodbridge Structured Funding, LLC, Woodbridge Structured Settlement Investments, LLC, Woodbridge Pre-Settlement  Funding, LLC, Woodbridge  Pre-Settlement  Funding 2, LLC, Riverdale Funding, LLC, Woodbridge Realty Unlimited, American Note Company, Woodbridge Wealth, and all of its agents, representatives, divisions, groups, parents, subsidiaries, consolidated variable-interest entities, subdivisions, predecessors, successors, and affiliated entities, and the present and former officers, directors, employees, partners, principals, representatives, and agents of any of the foregoing entities." *See, e.g.,* SEC Subpoena to GBH CPAs, LLC (March 6, 2017).

5

17.     Subsequently, subpoenas were directed to third-party companies whose only connection to Woodbridge is that they have or had a business relationship with Woodbridge sometime since 2011 (such as payroll processors); third-party financial planners who sell or sold Woodbridge products in addition to products from other companies; and professional accounting and law firms that serve Woodbridge in addition to their other clients.  (The "Third-Party Entity Subpoenas").

18.     Fifty-seven of the subpoenas were directed to individuals (the "Individual Subpoenas").  The Individual Subpoenas include:

- subpoenas directed to 30 different current employees in six different states

- subpoenas directed to 10 different former employees in California

- three subpoenas directed to its outside counsel and his law firm in California

- four separate subpoenas directed to its outside counsel and his law firm in Colorado; and

- three separate subpoenas directed to its outside counsel and his law firm in Connecticut.

19.     In connection with the Individual Subpoenas referenced in paragraph 18 above, Woodbridge has retained at its expense eight different law firms, including the company's outside counsel, to represent the persons and entities subject to Individual Subpoenas.

20.     With respect to the subpoenas referenced in the preceding paragraphs, more than two dozen requested testimony and the production of documents in the personal possession of subpoenaed witnesses (the "Testifying Witnesses").  Others requested documents without testimony.  More than 30 current and former employees have testified, many of them traveling from as far away as California to the SEC's office in Miami at the Company's expense.

21.     With respect to the Testifying Witnesses referenced in the preceding paragraph 20, four voluntarily traveled from California to Miami (primarily at Woodbridge's expense) to testify in the SEC Investigation; one traveled from Connecticut to Miami, one traveled from New Jersey to Miami, one traveled from Tennessee to Miami, one traveled from Daytona Beach (five hours each way) to Miami; two traveled from north-central Florida to Miami; and one traveled from Ohio to Miami. Fifteen additional Testifying Witnesses traveled to the SEC regional office in California; two traveled from their homes in Colorado to the SEC regional office in Denver; and one traveled from Connecticut to the SEC's regional office in Boston.

22.     On August 16 and 17, 2017, the SEC served an additional 210 subpoenas on Woodbridge's registered agent, seeking records from limited liability companies involved in Woodbridge's acquisition of real estate.

**Production of Emails**

23.     Woodbridge has never refused to provide emails in response to the Subpoena. In a good faith effort to move forward with email discovery, BSF wrote to SEC Senior Attorney Scott Lowry and initially proposed 23 search terms: on behalf of BSF's nonentity clients: (Tab 3.)

| | | |
|---|---|---|
| account | income | rate |
| accredited | investment | return |
| asset | ledger | revenue |
| balance | liability | Shapiro |
| bonus | minutes | subscription |
| budget | offering | |
| commission | private placement | |
| default | PPM | |
| fund | quarterly | |

24.     The twenty-three terms were intended to be a starting point for negotiations with staff to select a manageable set of terms from the list of 23 or to propose alternate search terms,

or, at a minimum initiate a discussion over so-called Boolean or "proximity word searches".

Instead, by letter dated May 18, 2017 (Scott Lowry), the staff directed Woodbridge to run all 23

proposed terms, plus an additional 34 search terms, four of which duplicated terms proposed in

BSF's April 21 letter.  (Tab 4.)  Duplicate terms are struck-through below, leaving a total of 53

terms:

| | | |
|---|---|---|
| ~~Private placement~~ | Settlement | [Shapiro]@aol.com |
| ~~PPM~~ | Presentation | Mortgage |
| Investor | Sales agent | Commission |
| ~~Offering~~ | Financial planner | Fee |
| Lender | Advisor | Override |
| Loan | Paid | [DR] |
| "first position commercial | Pay | [DR] |
| mortgage" | Payment | [NP] |
| FPCM | Interest | [NP] |
| Bridge | Principal | Bob |
| Construction | Refund | ~~Shapiro~~ |
| Lottery | | |
| Structured | | |

25.     While the staff repeatedly refers to its list of 53 search terms as a "prioritization,"

the proposed terms did not appreciably reduce but rather exponentially compounds

Woodbridge's burden.  Moreover, while it took the staff nearly a month simply to respond to the

terms we proposed in April, the staff repeatedly impugns Woodbridge in a publicly filed

document, falsely accusing Woodridge of "refusing" to comply with the subpoena.  Appl. at 2, 7,

11.

26.     Woodbridge has and continues to diligently comply with the SEC's other

subpoenas and requests.  Since May 18 alone, the Company has:

- Produced more than 400,000 more pages of documents in response to the SEC subpoena, including records from Mercer Vine and Woodbridge Realty of Colorado, bringing Woodbridge's total production in excess of a million pages; (WOODBRIDGE SEC_837763 – 1312041)

- Facilitated and provided the testimony of eight current employees of Woodbridge and Mercer Vine Realty in California in June;

- Facilitated and provided the testimony of seven additional current employees of Woodbridge in California and Woodbridge Reality of Colorado in August;

- Facilitated and provided the testimony of outside legal counsel in Connecticut;

- Facilitated and provided the testimony of outside legal counsel in Colorado;

- Facilitated and provided the testimony of four outside financial planners who sold Woodbridge products;

- Responded to fifteen document subpoenas served on current employees of Woodbridge, Mercer Vine, and Woodbridge Realty of Colorado;

- Produced documents on behalf of Woodbridge's outside legal counsel in Connecticut; (HSLLP_SEC 035133 – 045121).

- Produced documents on behalf of outside legal counsel in Colorado; (BGPC_SEC000001 – 000359).

- Produced documents referenced in testimony, including those referred to as the "DB Documents," which moots the request for those documents in the pending Application (WOODBRIDGE SEC_837763 – 837862, 884681 – 884683).

27.    Woodbridge was in the process of analyzing the proposed email search terms when the SEC, without warning, filed its Application to enforce the Subpoena in federal court. Despite the Application, Woodbridge continues to move forward with email production, even before the Court issued an order to show cause.

28.    Woodbridge has run searches for each of the fifty-three terms with participant qualifiers (participants: "[Shapiro]@aol.com") (participants: "[NP]@aol.com").  (The "Woodbridge" email addresses for NP and Mr. Shapiro have never been operational, so Woodbridge did not include those participants as qualifiers.)  The number of "hits" generated by these test searches did not reduce the database to a manageable size.  More than half of the staff's proposed terms resulted in hits that numbered in the thousands.

9

29.     Despite the exorbitant number of hits, Woodbridge continued to work toward a reasonable solution.  Based on these results, Woodbridge excluded the overly inclusive terms to produce a list of the most efficient twenty-five search terms (*i.e.,* 1,000 or fewer hits).  By letter dated August 16, 2017 (Tab 5), BSF submitted the following revised list of terms:

| | | |
|---|---|---|
| Private placement | "financial planner" | Bridge |
| PPM | Override | Settlement |
| Offering | Budget | Commission |
| "first position | Income | Fee |
| commercial | Ledger | Asset |
| mortgage" | Minutes | Balance |
| Lottery | Quarterly | Bonus |
| Presentation | Revenue | Default |
| "sales agent" | Subscription | Liability |

30.     Given that the SEC issued its Formal Order of investigation almost a year ago, and given the vast amount of information that Woodbridge has already provided in response to the Subpoena, Woodbridge has requested that the staff select from this list of twenty-five a subset of those most relevant to the staff's investigation.  By letter dated August 16, 2017, Woodbridge agreed to undertake a review once the staff identified the most relevant terms from the list of 25.  (Tab 5.)

31.     On August 24, the staff made a counterproposal which ignored the fact that, as previously agreed, Woodbridge ran the 53 search terms through the DR/RS/NP Database (approximately 14 GB).  Instead, the staff demanded that, in less than two weeks' time, Woodbridge provide "***the entire universe of non-privileged company emails*** sent to, sent from or received by: (A) Mr. Shapiro's company e-mail address ***and personal e-mail address***; (B) [DR's] company email address ***and personal email address***; and, (C) [NP]'s company email address ***and personal email address***, [l]imited by the 25 search terms you listed on page 4 of your August 16th letter which produced 1,000 or fewer hits."  (Tab 6) (emphasis added).

32.     Still trying to find a reasonable solution to email production, Woodbridge sought the assistance of a third-party vendor, Rational Enterprise ("Rational").  To determine the cost-effectiveness and efficiency of this option, Woodbridge exported the "entire universe of emails" (as the SEC requested, Tab 6) of DR to Rational.  Rational loaded the emails on its system to create a searchable database.  The export and extraction by Rational took a total of 5 business days.  Upon successful upload, Rational reported that the volume of emails and attachments in the DR database comprised a total of approximately of 325 GBs.  Rational's standard charge to upload and extract emails, and to load them on the Rational site, is $90 per GB.  Thus, the estimated cost to upload the "entire universe" of DR emails alone, as estimated by Rational, will be approximately $30,000.  Attached to my Declaration is a letter from Carey Trappenburg, Sr. Client Manager at Rational, setting forth these results. (Tab 7.)

33.     The SEC's latest demand covers more than 130 current employees and, at latest estimate, more than 9000 GBs.  Based on Rational's standard upload charge of $90 per GB, the cost would be approximately $800,000 ($90 per GB) just to upload the emails to a third party vendor platform and extract them to a searchable database.

34.     The staff characterizes its Application as one that merely seeks the "priority" emails of three Woodbridge employees.  Appl. at 17-18.  What the staff fails to explain, however, is that two of those employees (Shapiro and NP) started working at Woodbridge years before the company grew large enough to have a Woodbridge domain.[2]  Accordingly, they used and continue to use personal AOL accounts for both work and personal emails.  The staff also

---

[2] As Woodbridge's IT Director confirmed, several Woodbridge employees (including Shapiro and NP) started working at Woodbridge long before the company grew large enough to have its own "Woodbridge" email domains.  The business-related emails of these employees, therefore, are with personal email providers such as AOL.

11

fails to disclose that its latest demand on August seeks the *personal* emails of DR.  (Tab 6.) Woodbridge does not have custody or control of the AOL emails or DR's personal emails; Shapiro, NP and DR are not represented by Woodbridge's counsel; and neither the AOL emails nor DR's personal emails is covered by the Subpoena.

35.    The staff argues that Woodbridge should produce the requested emails because "[t]he Commission needs to identify the universe of Woodbridge investors."  Appl. at 14.  The staff already has that information and has had it since May 3, 2017, at the latest.  The identities of Unit investors and FPCM lenders are contained in the internal accounting records, the FPCM closing binders, and the Unit subscription agreements, which Woodbridge produced long ago. These documents can be found in WOODBRIDGE SEC_116616 – 123365 (produced February 15); WOODBRIDGE SEC_188120 – 834465 and 01154263 – 01312041 (produced between April 6 and April 28, and updated September 1); WOODBRIDGE SEC_834589 – 837760 (produced between April 28 and May 3).  The emails sought by the SEC will shed no light and have no evidentiary value on those issues.

36.    The staff argues that Woodbridge should produce the requested emails because "[t]he compensation earned by sales agents and financial planners at Woodbridge is of high importance."  Appl. at 14.  The staff has that information.  Woodbridge's financial records contain a complete listing of any payments made to sales agents and financial planners. Woodbridge's production of Form 1099s confirm the compensation paid to all outside financial planners.  These documents can be found in WOODBRIDGE SEC_000837 – 001472 (produced between January 17 and January 25); and WOODBRIDGE SEC_834693 – 837760 (produced on May 3); and WOODBRIDGE SEC_884681 – 884683 (produced on August 25).  Similarly, the emails sought by the staff will also shed no light and have no evidentiary value on those issues.

**Privilege Log**

37.     Woodbridge has never refused to provide a privilege log.  Woodbridge will provide a privilege log upon completion of its production, as is customary in any proceeding. While Woodbridge has produced more than a million documents in response to a Subpoena that is overbroad on its face, it does not follow that Woodbridge should be required to create a privilege log that covers nearly every document in the company dating back to January 1, 2012. The shear breadth of the Subpoena and the additional records sought in the Application (which extend beyond the Subpoena) makes it prohibitively expensive and impractical to create a document by document privilege log, and therefore it is Woodbridge's current plan to produce a category privilege log.

38.     I understand that the SEC has proposed that Woodbridge should simply run search terms through its documents to capture privileged documents.  To run such terms would require the creation of a searchable database for 130 different email custodians.  Additionally, the million pages of documents already produced to the SEC are not currently in word-searchable format (except for those documents produced in native format).  Thus, to run search terms through the non-email production, Woodbridge would have to transfer the documents already produced to its IT vendor and load those documents on a searchable platform at additional expense.

39.     In its latest email from Mr. Koonin (August 24), the SEC proposed a possible clawback arrangement under which the SEC would agree to return documents that the SEC deems are privileged.  (Tab 6.)  The SEC has never presented the full terms of such an agreement to Woodbridge.  However, it is well recognized that clawback arrangements work only because both sides have incentive to be reasonable:  if plaintiff requests the "clawback" of an

inadvertently produced document, defendant is incentivized to comply with the request because the defendant might well find himself or herself in the same position later in discovery. The SEC has no such incentive. Indeed, the SEC Enforcement Manual *removes* any consequences that the SEC might suffer for responding unreasonably to a clawback request. The SEC Enforcement Manual requires, as a condition to the agreement, that Woodbridge waive of any right to assert that the SEC's wrongful retention of a privilege document tainted the investigation.[3]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this ___ day of September, 2017 in Tolland, Connecticut.

_____
Robert Reed

---

[3] *See* SEC Enforcement Manual at § 4.2.1 ("under the terms of the written agreement, the party must agree, among other things, not to assert that the staff's investigation has been tainted by the staff's receipt, review, examination, or use of any material later determined to be privileged.")

# **Tab 1**



DAVID NELSON
Tel.: (954) 377-4233
E-mail: dnelson@bsfllp.com

August 25, 2017

**VIA EMAIL AND FEDERAL EXPRESS**

Scott A. Lowry, Senior Counsel
U.S. SECURITIES AND EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, FL 33131

Re:   **Woodbridge Mortgage Investment Fund III, LLC (FL-04024) (Referenced Documents)**

Dear Mr. Lowry:

I write on behalf of our clients Woodbridge Group of Companies, LLC ("Woodbridge") and ▮▮▮▮▮▮ in response to the SEC subpoena dated January 31, 2017 and your letter dated May 18, 2017. The letter references documents identified by several witnesses during their SEC testimony, including by ▮▮▮▮▮▮ (the "Referenced Documents").

As explained in our letter on behalf of Woodbridge dated May 30, 2017, Woodbridge has already produced many of the Referenced Documents in its rolling production to the SEC in response to the SEC subpoena. With this response, Woodbridge is producing additional Referenced Documents via email to the address: ENF-CPU@sec.gov. These documents can be found in the Bates range WOODBRIDGE SEC_884681 through WOODBRIDGE SEC_884683 and are responsive to the following bullet reference in the staff's May 18 letter:

- Excel Chart of FPCM and PPM Investors (aka "Main Tracker"): Identified during the testimony of ▮▮▮▮▮ (Trans. P.20-27) (Note that the actual and only file name is "Investment & Loan Docs Tracker");

- Chart of Sales Commissions (aka "Comp Submission Template"): Identified during the testimony of ▮▮▮▮▮ (Trans. p.28-31) (Note that the actual and only file name is "Comp Submissions Template");

- Biweekly Tracking Chart from Accounting with Sales Agent and Financial Planner Commissions: Identified during the testimony of ▮▮▮▮▮ (Trans. p.85-89; 94-95) (Note that the actual and only file name is "MKTG BONUS-FOR APPROVAL 10-27-16").

This production completes Woodbridge's production of ▮▮▮▮▮ Referenced Documents.

Woodbridge and ▮▮▮▮▮ request confidential treatment of this letter and the

BOIES SCHILLER FLEXNER LLP



Scott A. Lowry
August 25, 2017
Page 2

referenced documents (the "Confidential Material") under the Freedom of Information Act
("FOIA") for reasons of personal privacy and business confidentiality.

The Confidential Material is exempt from mandatory disclosure under various provisions
of FOIA, including 5 U.S.C. § 552(b)(4) (which protects confidential commercial or financial
information obtained from a person), 5 U.S.C. § 552(b)(7) (which protects records or
information compiled for law enforcement purposes), and 5 U.S.C. § 552(b)(6) (which protects
files that, if disclosed, would constitute an unwarranted invasion of personal privacy).
Moreover, disclosure of these Confidential Materials may be prohibited under 18 U.S.C. § 1905,
and further protections may be available under the Privacy Act of 1974, 5 U.S.C. § 552a.
Finally, the Confidential Material is protected from disclosure because our clients would not
customarily release it to the public.

In accordance with 17 C.F.R. § 200.83 and other applicable laws and regulations, the
Confidential Material is submitted to the Commission with our clients' request, through the
undersigned, that it be kept in a nonpublic file and that only Commission staff have access to it.
Our clients request that the Commission notify the undersigned by telephone (954-377-4233)
immediately after receiving any FOIA request for this letter or its enclosure, or any court order,
subpoena, or summons seeking the same. Our clients request that the undersigned immediately
be notified of such request, be furnished a copy of all written materials pertaining to such request
(including but not limited to the request itself), and be given advance notice of any intended
release so that our clients have the opportunity to object to such disclosure and pursue any
available remedies.

Should the Commission be inclined to grant any FOIA request for the Confidential
Material, our clients expect that the procedures set forth in 17 C.F.R. § 200.83 and Executive
Order 12,600, 52 Fed. Reg. 23,781 (June 23, 1987), will be followed. In that case, our clients
will further substantiate their request for confidential treatment, and will request a hearing on the
claim of exemption. Our clients further request that the Commission destroy all materials
submitted to it when this matter is concluded.

Finally, if the Commission or its staff determines to transfer any of the Confidential
Material to another federal agency, please forward a copy of this letter to that agency along with
the Confidential Material, and indicate that our clients have requested confidential treatment of
the material.

Sincerely,

David Nelson

DN/jm



Scott A. Lowry
August 25, 2017
Page 3


Enclosures:
WOODBRIDGE SEC_884681 through WOODBRIDGE SEC_884683 (*via email*)

cc:   Freedom of Information Act Officer (*via FedEx*)
      Office of FOIA Services
      U.S. Securities and Exchange Commission

# **Tab 2**

**Production Date: November 30, 2016**

SEC Meeting: Closing binder for 461 New Lots Avenue (Woodbridge SEC 000001 – 000183)

**Production Date:  December 28, 2016**

Woodbridge's Form Ds for each fund (Woodbridge SEC 000184 – 000228)
PPMs for each fund (Woodbridge SEC 000229 – 000822).
Excerpt of Woodbridge's internal telephone directory (Woodbridge SEC 000823)

**Production Date: January 17, 2017**

Job Descriptions for various positions at Woodbridge (Woodbridge SEC 000824 – 000836)
Form 1099s issued by Woodbridge for outside compensation paid for the years:
2012 (Woodbridge SEC 000837 – 000861),
2013 (Woodbridge SEC 000862 – 000898),
2014 (Woodbridge SEC 000899 – 000977), and
2015 (Woodbridge SEC 000978 – 001205).

**Production Date: January 25, 2017**

Form 1099s issued by Woodbridge for outside compensation paid for the year:
2016 (Woodbridge SEC 001206 – 001472)

**Production Date: February 15, 2017**

Woodbridge's structured settlements program (Woodbridge SEC 001473 – 116615)
Subscription agreements of PPM unitholders  (Woodbridge SEC 116616 – 123365)
Defaults of commercial loans issued by Woodbridge (Woodbridge SEC 123366 – 140310)
Property appraisals (Woodbridge SEC 140311 – 150776) and
Closing binders (Woodbridge SEC 150777 – 177301)

**Production Date: March 9, 2017**

Foreclosure Deeds (Woodbridge SEC 177302 – 177538)
Additional Closing Binder docs (Woodbridge SEC 177539 – 188119)

**Production Date: March 17, 2017**



████████████ emails (██████ SEC 000001 – 000097)
      █████ emails (██████ SEC 000001 – 000044)
      three transaction files (████████ 00000001 – 00001172)

**Production Date: March 24, 2017**

████████████ emails (██████ SEC 000001 – 000005)

1

**Production Date: March 27, 2017**

███████ supplemental emails (██████ SEC 000045 – 000052)

**Production Date: April 6, 2017**

███████ closing statements (████████ 00001173 – 00001297)
Woodbridge FPCM closing binders (Woodbridge SEC 188120 – 388160)

**Production Date: April 14, 2017**

Woodbridge FPCM closing binders (Woodbridge SEC 388161 – 500625)

**Production Date: April 21, 2017**

Woodbridge FPCM closing binders (Woodbridge SEC 500626 – 669366)
███████ Property list and Entity List (not stamped)

**Production Date: April 28, 2017**

Woodbridge FPCM closing binders (Woodbridge SEC 669367 - 834465)
███████ "Bible" (Woodbridge SEC 834466 – 834587)
███████ Closed and Funded spreadsheet (Woodbridge SEC 834588)
███████ Cancelled spreadsheet (Woodbridge SEC 834589)
███████ Coming due spreadsheet (Woodbridge SEC 834590)
███████ Mtg + Seniors 30 Day chart (Woodbridge SEC 834591)
███████ Paid Off chart (Woodbridge SEC 834592)

**Production Date: May 3, 2017**

Quickbooks and Bank Statements for:
WCBLF 1 (Woodbridge SEC 834593 – 834657)
WCBLF 2 (Woodbridge SEC 834658 – 834670)
WMIF 1 (Woodbridge SEC 834671 – 835086)
WMIF 2 (Woodbridge SEC 835087 – 835579)
WMIF 3 (Woodbridge SEC 835580 – 836357)
WMIF 3a (Woodbridge SEC 836358 – 836775)
WMIF 4 (Woodbridge SEC 836776 – 836858)
Woodbridge Group of Companies (Woodbridge SEC 836859 – 837175)
Woodbridge Structured Funding (Woodbridge SEC 837176 – 837760)
Property sheets (Woodbridge SEC 837761 – 837762)
Mercer Vine Property Sheets (Woodbridge_MV 000001 – 000002)
Colorado Realty Property Sheets (Woodbridge_WC 000001 – 000002)

**Production Date: May 12, 2017**

[REDACTED]          Closing binders ([REDACTED]_SEC 000001 – 026597)
                    Collateral Assignments ([REDACTED]_SEC 026598 – 035132)

**Production Date: May 19, 2017**

[REDACTED]          closing statements ([REDACTED]_SEC000001 – 000160)

**Production Date: May 31, 2017**

[REDACTED] Master List (Woodbridge SEC_837860) *out of sequence

**Production Date: June 1, 2017**

[REDACTED]          Life Contingent Spreadsheet and Funding Chart (Woodbridge SEC_837763-837764)

**Production Date: June 2, 2017**

[REDACTED] Loan Payment pdf (Woodbridge SEC_837765 – 837859).

**Production Date: June 6, 2017**

[REDACTED]          CA Properties Database (Woodbridge SEC_837861)
                    SS Master List (Woodbridge SEC_837862)

**Production Date: June 14, 2017**

Woodbridge 5/3/2016 Document Hold (Woodbridge SEC_837863 – 837864)

**Production Date: June 30, 2017**

Real Estate Documents (Woodbridge SEC_837865 – 884225)
- Lucid West (837865-838201)
- Plus Development (838202 – 841214)
- Real Estate – CA Properties (841215 – 850336)
- Real Estate – CO Properties Construction Contract (850337 – 850981)
- Real Estate – CO Properties (850982 – 851680)
- Real Estate – Other State Properties (851681 – 852106)
- Real Estate & Development (852107 – 864770)
- Real Estate (864771 – 884225)

**Production Date: July 28, 2017**

██████████ trust account records and transaction checklists (████_SEC000161 - 000359)

██████████ documents (████████_SEC 035133 – 045121)

**Production Date: August 18, 2017**

Real Estate LLC Certificates of Organization (Woodbridge SEC_884226 – 884680)

**Production Date: August 25, 2017**

 Investment & Loan Docs Tracker (Woodbridge SEC_884681)
Comp Submissions Template (Woodbridge SEC_884682)
MKTG BONUS-FOR APPROVAL 10-27-16 (Woodbridge SEC_884683)

**Production Date: September 1, 2017**

Construction loan docs (Woodbridge SEC_00884684 – 00999134)
Mezzanine loan docs (Woodbridge SEC_00999135 – 01154262)
Updated FPCM docs (Woodbridge SEC_01154263 – 01312041)

4

# Tab 3



DAVID NELSON
Tel.: (954) 377-4233
E-mail: dnelson@bsfllp.com

April 21, 2017

**VIA EMAIL AND FEDERAL EXPRESS**

Scott A. Lowry, Senior Counsel
U.S. SECURITIES AND EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, FL 33131

Re:     **Subpoenas for Certain Individuals' Email Records**

Dear Mr. Lowry:

I write on behalf of our clients, ███████, ███████, and ███████, in regards to your subpoenas of March 2 and March 23, 2017, requesting our clients produce certain emails, as well as to follow up on our correspondence to you of March 17, 2017.

As you know, these individuals have identified personal emails accounts under each individual's ownership and control that potentially contain emails responsive to the staff's subpoenas. But as we have informed the staff, these accounts contain many thousands of emails, a significant number of which are wholly unresponsive to the subpoenas. We have previously suggested using a list of mutually agreed search terms to guide our clients' efforts and more reasonably narrow the scope of the subpoenas. In furtherance of this suggestion, we propose the following list of search terms:

| | | |
|---|---|---|
| account | fund | PPM |
| accredited | income | quarterly |
| asset | investment | rate |
| balance | ledger | return |
| bonus | liability | revenue |
| budget | minutes | Shapiro |
| commission | offering | subscription |
| default | private placement | |

Please let us know if these terms are acceptable to you and, if they are, we will begin the process of gathering and producing the responsive emails.

Our clients request confidential treatment of this letter (the "Confidential Material") under the Freedom of Information Act ("FOIA") for reasons of personal privacy and

BOIES SCHILLER FLEXNER LLP

401 East Las Olas Boulevard, Suite 1200, Fort Lauderdale, FL 33301 | (t) 954 356 0011 | (f) 954 356 0022 | www.bsfllp.com



Scott A. Lowry
April 21, 2017
Page 2

business confidentiality.

The Confidential Material is exempt from mandatory disclosure under various provisions of FOIA, including 5 U.S.C. § 552(b)(4) (which protects confidential commercial or financial information obtained from a person), 5 U.S.C. § 552(b)(7) (which protects records or information compiled for law enforcement purposes), and 5 U.S.C. § 552(b)(6) (which protects files that, if disclosed, would constitute an unwarranted invasion of personal privacy). Moreover, disclosure of these Confidential Materials may be prohibited under 18 U.S.C. § 1905, and further protections may be available under the Privacy Act of 1974, 5 U.S.C. § 552a. Finally, the Confidential Material is protected from disclosure because our clients would not customarily release it to the public.

In accordance with 17 C.F.R. § 200.83 and other applicable laws and regulations, the Confidential Material is submitted to the Commission with our clients' request, through the undersigned, that it be kept in a nonpublic file and that only Commission staff have access to it. Our clients request that the Commission notify the undersigned by telephone (954-377-4233) immediately after receiving any FOIA request for this letter, or any court order, subpoena, or summons seeking the same. Our clients request that the undersigned immediately be notified of such request, be furnished a copy of all written materials pertaining to such request (including but not limited to the request itself), and be given advance notice of any intended release so that our client has the opportunity to object to such disclosure and pursue any available remedies.

Should the Commission be inclined to grant any FOIA request for the Confidential Material, our clients expect that the procedures set forth in 17 C.F.R. § 200.83 and Executive Order 12,600, 52 Fed. Reg. 23,781 (June 23, 1987), will be followed. In that case, our clients will further substantiate their requests for confidential treatment, and will request a hearing on the claim of exemption. Our clients further request that the Commission destroy all materials submitted to it when this matter is concluded.

Finally, if the Commission or its staff determines to transfer any of the Confidential Material to another federal agency, please forward a copy of this letter to that agency along with the Confidential Material, and indicate that our client has requested confidential treatment of the material.

Sincerely,

David Nelson

DN/jm
cc:    Freedom of Information Act Officer (*via FedEx*)
       Office of FOIA Services
       U.S. Securities and Exchange Commission

# Tab 4



**DIVISION OF
ENFORCEMENT**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### MIAMI REGIONAL OFFICE
801 BRICKELL AVENUE
SUITE 1800
MIAMI, FLORIDA 33131

SCOTT A. LOWRY
SENIOR COUNSEL
DIRECT DIAL: 305.982.6387
LOWRYS@SEC.GOV

May 18, 2017

**Via Overnight Delivery with
Advance Email to dnelson@bsfllp.com**

Woodbridge Group of Companies, LLC
c/o David Nelson. Esq.
Boies, Schiller & Flexner LLP
401 East Las Olas Boulevard, Suite 200
Fort Lauderdale, FL 33301-22

    Re:    <u>Woodbridge Mortgage Investment Fund III, LLC (FL-04024)</u>

Dear Mr. Nelson:

    We write regarding your letters dated April 21, 2017, May 18, 2017 and your clients' productions in this matter, specifically each of the productions from Woodbridge Group of Companies, LLC ("Woodbridge"), ████████, ████████, ████████, ████████, ████████, ████████, ████████, ████████, ████████, ████████, ████████, and ████████.

    **A. Prioritized Production**

    The staff's subpoena to Woodbridge dated January 31, 2017 required the production of documents no later than February 15. As discussed in our letters dated February 28, 2017, March 7, 2017, March 22, 2017, April 7, 2017 and May 16, 2017, Woodbridge has produced some categories of documents responsive to the subpoena, but many other categories of documents have not been produced. To accommodate Woodbridge's production delays, the staff prioritized the production of the company's financial records. On May 3, 2017, Woodbridge produced certain QuickBooks files containing financial records and has now indicated that it has completed its production of this category of documents.

    By this letter, we request that, of the remaining categories of documents due under the subpoena, Woodbridge now prioritize the following documents for immediate production:

Woodbridge Group of Companies, LLC
c/o David Nelson. Esq.
May 18, 2017

(1) <u>Prioritized Production of Specific Documents Identified in Testimony</u>

● Excel Chart of Structured Settlements and Investors (aka "Master List"):  Identified during the testimony of ████████ (Trans. p.43-44; 61 and 64)

● Excel Chart of FPCM and PPM Investors (aka "Main Tracker"):  Identified during the testimony of ████████ (Trans. p.20-27)

● Chart of Sales Commissions (aka "Comp Submission Template):  Identified during the testimony of ████████ (Trans. p.28-31)

● Chart of Loans 30 Days Due:  Identified during the testimony of ████████ (Trans. p.26-28; 49; 180-81); Identified during the testimony of ████████ (Trans. p.61-62, 65-66)

● Biweekly Tracking Chart from Accounting with Sales Agent and Financial Planner Commissions:  Identified during the testimony of ████████ (Trans. p.85-89; 94-95)

● Charts Identified During the Testimony of ████████:  (aka "Life Contingent Spreadsheet"; "Funding Chart"; "Woodbridge Wealth Notes Coming Due Chart"; "Paid Off Spreadsheet" and "Cancelled Spreadsheet") (Trans. p.71, 74-78, 80-81; 84)

● Spreadsheet of Property Purchases:  Identified during the testimony of ████████ (Trans. p.138-39;

● Property Closing Statements:  Identified during the testimony of ████████ (Trans. p.111-12)

● List of Loans (aka "Bible," "First Payment Due Date"):  Identified during the testimony of ████████ (Trans. p.89-93; 106; 158-60)

● Monthly Payments List:  Identified during the testimony of ████████ (Trans. p. 106-07)

● Closed and Funded List:  Identified during the testimony of ████████ (Trans. p.160)

● List of Defaulted Loans Not Brought Current:  Identified during the testimony of ████████ (Trans. p.166-73; 246)

● Excel Spreadsheet of California Properties Database:  Identified during the testimony of ████████ (Trans. p.95)

● Structured Settlement Chart:  Identified during the testimony of ████████ (Trans. p. 96-97)

● List of Woodbridge Wealth Employees Paid by ████████:  Identified during the testimony of ████████ (Trans. p.58-59)

Woodbridge Group of Companies, LLC
c/o David Nelson. Esq.
May 18, 2017

● Employee Phone List:  Identified during the testimony of ████████(Trans. p.59-64; 143; 197; 231-34)

● Lists of Current and Former Employees (aka "Employee Worksheet"; "Terminated Employee Worksheet"):  Identified during the testimony of ████████ (Trans. p.120-22; 125-27; 229-31)

● Payroll Worksheet Document:  Identified during the testimony of ████████ (Trans. p.221-22)

    Based on the description of these documents during testimony, the staff believes that these documents are readily identifiable and able to be produced immediately.  We request production of these documents immediately, but in any event, no later than **Thursday, May, 25, 2017**.

    (2) Prioritized Production of Specific E-mail

    The staff's January 31, 2017 subpoena to Woodbridge required the production, among other items, of company e-mail.  (Requests 1k, 1l, and 1m).  To date, Woodbridge has not produced any company e-mail responsive to these requests.  By this letter, we request that Woodbridge prioritize the immediate production of company e-mails sent to, from, or received by the following custodians:

● Robert Shapiro (company e-mail addresses)
● ████████aol.com (any company e-mail sent to, received from or copied to this address)
● ████████DR
● ████████NP

    To expedite the production of responsive e-mails, we propose that Woodbridge use the search terms proposed in your letter dated April 21, 2017 along with the following additional terms (collectively "E-mail Search Terms"):  Private placement, PPM, Investor, Offering, Lender, Loan, "first position commercial mortgage," FPCM, Bridge, Construction, Lottery, Structured, Settlement, Presentation, Sales agent, Financial planner, Advisor, Paid, Pay, Payment, Interest, Principal, Refund, ████████aol.com, Mortgage, Commission, Fee, Override, ████████, ████,████, ████████,██ and ████.

    The staff requests that Woodbridge propose an estimated time-frame for the complete production of this limited number of initial e-mails.

    **B.    E-mail Production from Non-Entity Clients**

    For each of your non-entity, individual clients in this matter, the staff has subpoenaed the production of all personal e-mails used to conduct Woodbridge business relating to the subject matter of our investigation for the period from January 1, 2011 to present.  The staff is concerned that the search terms and protocol used by your clients may not be uncovering all responsive documents to our requests.  Despite the over six year period covered by the subpoenas, less than twenty e-mails have actually been produced.  For example, the following witnesses have

3

Woodbridge Group of Companies, LLC
c/o David Nelson. Esq.
May 18, 2017

represented that their search for responsive documents yielded no documents whatsoever:
████████████, ████████, ████████, ████████, ████████ and ████████.
Each of the remaining productions from your clients contain a *de minimus* number of documents:
████████ (2 e-mails); ████████ (former client) (2 emails) and ████████ (8 e-mails).

By this letter the staff requests that counsel provide it with the search terms and protocol used by its clients to conduct their respective searches for responsive documents to determine whether these search terms and protocol need supplementation to uncover responsive e-mails.

## C. E-mail Production from Remaining Non-Entity Clients

Counsel requested that the staff narrow the e-mail requests to certain non-entity clients prior to their respective searches for responsive documents. These clients include the following: ████████ (documents due March 17, 2017); ████████ (documents due March 17, 2017), ████████ (documents due April 3, 2017) and ████████ (documents due April 24, 2017). By this letter the staff requests that these clients use the E-mail Search Terms noted above to conduct their searches for responsive documents.

The following e-mail productions are past due and should be provided to the staff immediately: ████████ (documents due March 24, 2017) and ████████ (documents due April 28, 2017).

## D. Privilege Logs

The instructions to each of the subpoenas issued to your clients noted above required the producing party to indicate whether any documents called for by the subpoena were withheld for any reason, including a claim of attorney-client privilege, and to provide a list of items not being produced, and if applicable, a privilege log. None of your clients' productions appear to include this required information. By this letter, we request that each of your clients in this matter immediately supplement their productions to indicate whether any responsive documents were withheld and if applicable, produce a corresponding privilege log. For all future productions from these and any additional clients in this matter, we request that the producing party likewise provide this required information contemporaneously with each production.

If you have any questions or would like to discuss this matter, you may call me at 305.982.6387 or Linda S. Schmidt, Senior Counsel, at 305.982.6315.

Sincerely,

Scott A. Lowry
Senior Counsel
Division of Enforcement

4

# Tab 5



DAVID NELSON
Tel.: (954) 377-4233
E-mail: dnelson@bsfllp.com

August 16, 2017

**VIA EMAIL AND FEDEX**

Scott A. Lowry
U.S. SECURITIES AND EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, FL 33131

**Re: Woodbridge Mortgage Investment Fund III, LLC (FL-04024)**

Dear Mr. Lowry·

I write on behalf of our client, Woodbridge Group of Companies, LLC ("Woodbridge") in connection with our ongoing discussions regarding Woodbridge's production of company emails in response to the SEC subpoena issued on January 31, 2017 (the "Subpoena").

As stated in my letter dated August 3, 2017, as reiterated in our "meet and confer" discussions with SEC litigation counsel on August 10, and as repeated on numerous occasions in our correspondence and phone calls throughout the investigation, Woodbridge is committed to reaching a reasonable solution to email discovery.  Let us be clear:  Woodbridge has never refused to produce emails.

Based on recent experience (for example, the lack of response to our August 3 letter), however, it appears that the staff is more interested in portraying Woodbridge as noncompliant than in negotiating a meaningful narrowing to its overbroad demand for information.  Despite the staff's insistence that they have done this by "prioritizing" production, from our vantage point the staff has identified so many priorities that this has provided no solution at all.  The staff's proposal to reduce our review burden with respect to the 29,000 emails presently in question in the test database of a single employee consisted of fifty-three search terms that had negligible impact on the number to be reviewed.  Indeed, the proposed search terms included the individual's first and last name which—not surprisingly—appears in virtually every email to or from that individual without regard to subject matter.

The staff's unreasonable position is unfortunate.  In response to the other 27 subparts of the Subpoena, Woodbridge has demonstrated its good faith by producing documents totaling

BOIES SCHILLER FLEXNER LLP

401 East Las Olas Boulevard, Suite 1200, Fort Lauderdale, FL 33301 | (t) 954 356 0011 | (f) 954 356 0022 | www.bsfllp.com



Scott A. Lowry
August 16, 2017
Page 2

over a million pages.  Requiring compliance with the Subpoena as written with respect to emails will further increase the undue burden that has been imposed on Woodbridge.  Rather than come around to a reasonable position, the staff has apparently doubled down.  The Subpoena is already overly broad as written, and yet the staff apparently now is insisting on the production of emails that are even beyond the scope of the Subpoena, having now represented in court filings that they are demanding all emails to and from certain custodians *without regard to subject matter*.  *See* SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER ENFORCING AN ADMINISTRATIVE SUBPOENA," at 18 (July 17, 2017) ("SEC Enforcement Application").  Thus, while we continue to urge you to work with us to narrow the Subpoena in a manner that is workable, manageable, and will not deplete our resources, we cannot and will not waive our right to defend the Company against the staff's untenable position in the pending proceeding.

While Woodbridge is confident that a court would agree with its position (should it come to that), we remain hopeful and would prefer that the issues be resolved without the court's involvement.  We hope that you agree.  To that end, Woodbridge provides the following update with respect to the application of 53 search terms Woodbridge emails from custodian ████ DR ████ (████@woodbridgewealth.com).

By letter dated April 21 we proposed the following 23 search terms:

| | | |
|---|---|---|
| account | fund | PPM |
| accredited | income | quarterly |
| asset | investment | rate |
| balance | ledger | return |
| bonus | liability | revenue |
| budget | minutes | Shapiro |
| commission | offering | subscription |
| default | private placement | |

The twenty-three terms were intended to be a starting point, with the expectation that negotiations with staff would reduce the list of 23 to a manageable number.  Instead, by letter dated May 18, 2017 (Scott Lowry), the staff directed Woodbridge to run *all 23* proposed terms, as well as *an additional 34 search terms*, four of which duplicated terms proposed in BSF's April 21 letter.  Duplicate terms are struck-through below, leaving a total of 53 terms:



Scott A. Lowry
August 16, 2017
Page 3

| | | |
|---|---|---|
| ~~Private placement~~ | Structured | ▮▮▮▮@aol.com |
| ~~PPM~~ | Settlement | Mortgage |
| Investor | Presentation | Commission |
| ~~Offering~~ | Sales agent | Fee |
| Lender | Financial planner | Override |
| Loan | Advisor | ▮▮▮▮ |
| "first position commercial | Paid | ▮▮ |
| mortgage" | Pay | ▮▮▮ |
| FPCM | Payment | ▮▮▮▮ |
| Bridge | Interest | |
| Construction | Principal | ~~Shapiro~~ |
| Lottery | Refund | |

        We dispute the staff's characterization of the SEC's 53 search terms as a "prioritization," particularly to the extent that word is intended to suggest that the staff has somehow eased Woodbridge's ability to identify and turn over relevant emails. To the contrary, your proposed terms have not reduced the burden at all. Moreover, while it took the staff nearly a month simply to respond to the terms we proposed in April, the staff repeatedly impugns Woodbridge in its public court filings, falsely accusing Woodridge of "refusing" to comply with the subpoena based on a one week delay in getting back to you. *See* SEC Enforcement Application at 2, 7, 11. Although the staff's purported "prioritization" of search terms in the May 18 letter effectively put email production on hold because we have received no meaningful guidance from you on how to proceed, Woodbridge and its counsel have diligently complied with all of the SEC's other subpoenas and requests. Since May 18 alone, the Company has:

- Produced tens of thousands more documents in response to the SEC subpoena, including records from Mercer Vine and Woodbridge Realty of Colorado, bringing Woodbridge's total production to over a million pages;
- Facilitated and provided the testimony of eight current employees of Woodbridge and Mercer Vine Realty in California in June;
- Facilitated and planned for the testimony of seven additional current employees of Woodbridge in California and Woodbridge Realty of Colorado in August;
- Facilitated and provided the testimony of outside legal counsel ▮▮▮▮▮▮ (▮▮▮▮ ▮▮▮) in Connecticut;
- Facilitated and planned for the testimony of outside legal counsel ▮▮▮▮ (▮▮▮▮ ▮▮▮) in Colorado;
- Facilitated and provided the testimony of four outside financial planners who sold Woodbridge products;
- Responded to fifteen document subpoenas served on current employees of Woodbridge, Mercer Vine, and Woodbridge Realty of Colorado;
- Produced documents on behalf of Woodbridge's outside legal counsel in Connecticut (▮▮▮▮▮);
- Produced documents on behalf of outside legal counsel in Colorado (▮▮▮▮▮▮);
- Produced documents on behalf of outside legal counsel in California (▮▮▮▮▮).



Scott A. Lowry
August 16, 2017
Page 4

Woodbridge was in fact in the process of analyzing the proposed search terms when the SEC, without warning, filed its Application regarding the Subpoena in federal court. We have now completed that trial run. As the staff directed in its May 18 letter, Woodbridge ran searches for each of the fifty-three terms with participant qualifiers (participant: "████████@aol.com") (participant: "████████@aol.com"). The number of "hits" generated by these test searches did not reduce the database to a manageable size at all. More than half of the staff's proposed terms resulted in hits that numbered in the thousands.

Based on these results, we excluded those overly inclusive terms to produce a list of the most efficient twenty-five search terms (*i.e.,* 1,000 or fewer hits):

| | | |
|---|---|---|
| Private placement | Override | Commission |
| PPM | Budget | Fee |
| Offering | Income | Asset |
| "first position | Ledger | Balance |
| commercial | Minutes | Bonus |
| mortgage" | Quarterly | Default |
| Lottery | Revenue | Liability |
| Presentation | Subscription | |
| "sales agent" | Bridge | |
| "financial planner" | Settlement | |

Given that we are now less than a month away from the one-year anniversary of the Formal Order in this case, and given the vast amount of information that Woodbridge has already provided in response to the Subpoena, we deem it more than reasonable to ask that the staff select from this list of twenty-five a subset of those most relevant to the staff's investigation. Surely at this juncture of this exhaustive investigation the staff has a firm handle on what it is looking for. Once you have done so we will undertake a review.

Please let us know your response to this proposal, and what proposals you have to focus and reduce the burden on Woodbridge with respect to the other emails subject to the Subpoena. We look forward to your response.

The Confidential Material is exempt from mandatory disclosure under various provisions of FOIA, including 5 U.S.C. § 552(b)(4) (which protects confidential commercial or financial information obtained from a person), 5 U.S.C. § 552(b)(7) (which protects records or information compiled for law enforcement purposes), and 5 U.S.C. § 552(b)(6) (which protects files that, if disclosed, would constitute an unwarranted invasion of personal privacy). Moreover, disclosure of these Confidential Materials may be prohibited under 18 U.S.C. § 1905, and further protections may be available under the Privacy Act of 1974, 5 U.S.C. § 552a. Finally, the Confidential Material is protected from disclosure because our clients would not customarily release it to the public.



Scott A. Lowry
August 16, 2017
Page 5

        In accordance with 17 C.F.R. § 200.83 and other applicable laws and regulations, the Confidential Material is submitted to the Commission with our clients' request, through the undersigned, that it be kept in a nonpublic file and that only Commission staff have access to it. Our clients request that the Commission notify the undersigned by telephone (954-377-4233) immediately after receiving any FOIA request for this letter or its enclosure, or any court order, subpoena, or summons seeking the same. Our clients request that the undersigned immediately be notified of such request, be furnished a copy of all written materials pertaining to such request (including but not limited to the request itself), and be given advance notice of any intended release so that our clients have the opportunity to object to such disclosure and pursue any available remedies.

        Should the Commission be inclined to grant any FOIA request for the Confidential Material, our clients expect that the procedures set forth in 17 C.F.R. § 200.83 and Executive Order 12,600, 52 Fed. Reg. 23,781 (June 23, 1987), will be followed. In that case, our clients will further substantiate their request for confidential treatment, and will request a hearing on the claim of exemption. Our clients further request that the Commission destroy all materials submitted to it when this matter is concluded.

        Finally, if the Commission or its staff determines to transfer any of the Confidential Material to another federal agency, please forward a copy of this letter to that agency along with the Confidential Material, and indicate that our clients have requested confidential treatment of the material.

                                        Sincerely,

                                        David Nelson

DN/jm

cc:    Christine Nestor (*via email*)
       Russell Koonin (*via email*)

       Freedom of Information Act Officer (*via FedEx*)
       Office of FOIA Services
       U.S. Securities and Exchange Commission

# Tab 6

**Brendon Olson**

| | |
|---|---|
| **From:** | Koonin, Russell <kooninr@SEC.GOV> |
| **Sent:** | Thursday, August 24, 2017 2:16 PM |
| **To:** | David Nelson; James Grippando; Brendon Olson |
| **Cc:** | Nestor, Christine; Lowry, Scott |
| **Subject:** | Woodbridge - Response to August 23rd Letter |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dave,

Thank you for your letter of August 23rd.   I will forego responding to the commentary as to characterizations of past conferrals or requests, as it is not productive.

Here is our proposal:

1) **By August 29, 2017**, you provide us the Excel Chart of FPCM and PPM Investors (aka "Main Tracker") identified during the testimony of ████████ (Tran. P.20-27);

2) **By August 29, 2017**, you provide us the chart of Sales Commission (aka "Comp Submission Template"), identified during the testimony of ████████, (Trans. P. 27-31), and also specifically again identified in yesterday's testimony by ████████;

3) **By August 29, 2017**, you provide us the BiWeekly Tracking Chart from Accounting with Sales Agent and Financial Planner Commissions, identified during the testimony of ████████ (Trans. P. 85-89; 94-95);

4) **By September 5, 2017**, you provide us the entire universe of non-privileged company emails sent to, sent from or received by:
    (A)  Mr. Shapiro's company e-mail address and personal e-mail address;
    DR(B) ████████ company email address and personal email address; and,
    NP(C) ████████ company email address and personal email address
    Limited by the 25 search terms you listed on page 4 of your August 16th letter which produced 1,000 or fewer hits;

5) **By September 5, 2017**, you provide us the numerical results of hits returned for the other 28 search terms, when you searched Mr. Shapiro,      DR      and      NP      personal email addresses (providing hits generated separately for each email address).  (We will review the numerical results and get back with you); and,

6) **By September 5, 2017**, you provide us a privilege log of all withheld emails and other documents otherwise withheld for privilege that are responsive to the January 31, 2017 subpoena.

As we stated previously, to the extent you inadvertently disclose any privileged communications in this production, we will not deem that to be a waiver of privilege, and we will immediately destroy and/or return such emails in the event their privileged nature is not in dispute.

Please also note that this proposal should not be considered, in any way, a waiver of our intent to enforce any and all aspects of the January 31, 2017 subpoena (or others).  Nor should this be interpreted as an agreement that limiting the

email search to three employees and utilizing the 25 search terms you listed on page 4 of your August 16th letter are the appropriate universe of search terms that should be utilized going forward.

Thank you for working with us on these issues.   Please confirm your agreement.  We look forward to hearing from you.

_____

**Russell Koonin**
Senior Trial Counsel
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL, 33131
Tel:  (305) 982-6385
Fax: (305) 536-4154
Kooninr@sec.gov

# Tab 7



Rational Enterprise, LLC
521 Fifth Avenue, 25th Floor
New York, NY 10175
Tel: 212.719.4444

Rational Enterprise, LLC
2 Tower Place, 1st Floor
Albany NY, 12203
Tel: 518.489.3000

**VIA E-MAIL**

Kenneth Renae
Boies Schiller & Flexner
401 East Las Olas Boulevard, Suite 1200
Ft Lauderdale, FL 33301

September 1, 2017

Re:   **Woodbridge Matter Data Processing**

Dear Kenneth:

The PSTs from [DR]'s mailbox are currently extracting and we estimate we will have anywhere from 300-350GB of data once finished.  We generally see about 30,000 pages per GB of data. Based on an average page count of five pages per document we estimate a total of 1,950,000 documents. (assuming 325 GB of total data).

Based on this estimate, the cost for loading the PSTs to the site is approximately $30,000.  This includes a few hours of project manager time billed at $210 per hour.

Truly yours,

Carey Trappenburg